UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MIGNON A. KING, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-10380-ADB |
| | * | |
| CAROLYN W. COLVIN, Acting | * | |
| Commissioner of the Social Security | * | |
| Administration, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM & ORDER

September 11, 2015

BURROUGHS, D.J.

## I.    INTRODUCTION

Plaintiff Mignon A. King ("Ms. King"), who is proceeding pro se, brings this action

pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration (the

"Commissioner"). The Commissioner found that Ms. King was not disabled, and, consequently,

that she was not entitled to Supplemental Security Income ("SSI"). Before the Court is Ms.

King's motion to reverse the Commissioner's decision, or, in the alternative, to remand the

Commissioner's decision for the consideration of new evidence. [ECF Nos. 1, 26]. The

Commissioner has moved for an order affirming the decision. [ECF No. 29]. For the reasons

discussed herein, Ms. King's motion to reverse is allowed, on the grounds that the

Commissioner's decision was not supported by substantial evidence. This case will be remanded

to the Commissioner for further development of the record. The Commissioner's motion to

affirm the decision is denied.

II.     **BACKGROUND**

   **A.  Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability
        Claims**

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

   The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled," for the purposes of the Supplemental Security Income program, if he or she is

> unable to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or that has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The inability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §

416.905; see also Ross v. Astrue, No. CIV.A. 09-11392-DJC, 2011 WL 2110217, at *2 (D.

Mass. May 26, 2011).

   When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the
> determination may be concluded at any step along the process. The
> steps are: 1) if the applicant is engaged in substantial gainful work
> activity, the application is denied; 2) if the applicant does not have,
> or has not had within the relevant time period, a severe impairment
> or combination of impairments, the application is denied; 3) if the
> impairment meets the conditions for one of the "listed"
> impairments in the Social Security regulations, then the application
> is granted; 4) if the applicant's "residual functional capacity" is

such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

**B.  Summary of Facts**

Plaintiff Mignon King is a 51-year-old woman who claims to be disabled by various mental and physical conditions. Ms. King was born on January 6, 1964, and she was 46 years old as of September 27, 2010, the date that her alleged disability began. [See ECF No. 18, Administrative Record of Social Security Proceedings ("R."), 32, 125].[1] Ms. King alleges that she was the victim of a stalker who pursued her for a number of years. [R. 53, 344]. Although she now has a permanent restraining order in place, Ms. King allegedly suffers from anxiety, post-traumatic stress disorder, and other mental health issues. At the time she applied for SSI benefits, Ms. King lived alone in an apartment that she previously shared with her mother. [R. 52-53, 126]. Ms. King's mother passed away in September 2010 after suffering a stroke, and Ms. King claims that the shock and stress of this event re-triggered her PTSD and anxiety, and caused it to intensify. [R. 52-53]. Ms. King has since moved out of her late mother's home and now lives with a friend. [R. 44].

Ms. King completed college and holds two masters' degrees. [R. 32, 149; see also R. 346]. In the past, she has intermittently worked as a database assistant, an English instructor, a freelance proofreader, and an editorial consultant. [R. 55, 149, 184-191, 224-225]. Most recently, from January 2011 to May 2011, Ms. King taught a freshman writing class once a week at a local community college. Her only compensation, however, was a stipend of approximately $2500. [R.

---

[1] In this Memorandum, all citations to the SSA Administrative Record of Social Security Proceedings [ECF No. 18] will be indicated by the citation "R. __" indicating the relevant page number of the administrative record.

32-35]. Ms. King stated that she had difficulty completing this one-semester course because of her anxiety, PTSD, and mental health problems. [R. 33]. Prior to teaching the writing course in 2011, Ms. King last worked as a freelance proofreader until September 27, 2010. [R. 155]. At the time of the administrative hearing before the ALJ in October 2012, Ms. King was not working at all. [R. 32].

In her 2010 application for SSI, Ms. King alleged that she has various mental and physical conditions that limit her ability to work, including (1) anxiety, (2) posttraumatic stress disorder ("PTSD"), (3) panic attacks, (4) grief, (5) acid reflux, (6) migraines, (7) sleep problems, (8) heavy periods, and (9) degenerative osteoarthritis. [Id. 148]. In her Function Report submitted with her application [R 164-173], Ms. King claimed that after the onset of her alleged symptoms, she was no longer able to concentrate or read more than a few pages at a time; she was not able to deal with stress or work with other people; and she was no longer able to perform either simple or complex computer functions. [R. 165, 169]. She stated that she is forgetful to the point where it takes her a long time to get dressed in the morning; she feels "too shaky" to perform certain grooming activities; and her anxiety sometimes prevents her from leaving the house at all. [R. 167]. Ms. King's application also mentioned difficulties arising from alleged musculoskeletal problems, including osteoarthritis, and that these conditions cause back, knee, and hip stiffness or pain if she sits for too long, "especially at a computer." [R. 171]. She noted that she needs to take long breaks, and that "kneeling, bending, squatting, and lifting more than 7-10 pounds is a problem." [Id.]. However, Ms. King also reported that she was sometimes able to do laundry and clean the house for 1-2 hours per week, and that she makes trips to the grocery store, pharmacy, and the public library. [R. 164]. She stated that she usually leaves the house "once every day or two." [R. 167]. Although she is sometimes able to cook and prepare meals for

herself, at the time of her application, she was "not making complete meals most days." [R. 166]. Ms. King also stated that she was sometimes able to attend "poetry readings" and literary events on occasion, and that she used email and social media websites. [R. 168].

## C. Medical Chronology

The administrative record contains a number of medical records and reports, which the Court summarizes here.

### 1. Treating Sources

In 2002, Ms. King was evaluated by Dr. Michael G. Wilson of Brigham and Women's Hospital, where she was diagnosed with bilateral patellofemoral pain, and bilateral flat foot. Dr. Wilson noted that he had previously performed bilateral bunionectomies on Ms. King in 1993. Although Dr. Wilson noted that she had "patellofemoral crepitance bilaterally," she had good forefoot alignment and was able to walk on her toes without difficulty. [R. 248]. In addition, her foot X-rays were normal. Dr. Wilson prescribed orthotics and physical therapy. [Id.].

In March 2003, Ms. King was evaluated by Dr. Maitri Patel, M.D., at an outpatient psychiatry department at Brigham and Women's Hospital. Dr. Patel diagnosed Ms. King with PTSD, and noted that although she had "some traits of hypomania," she did not warrant a diagnosis of Bipolar II. Dr. Patel noted that Ms. King's anxiety seems to be "much improved" since her last hospitalization. [R. 249].[2]

In 2006, Ms. King was seen at Massachusetts General Hospital for complaints of neck pain that was "persistent over several months." She was diagnosed with "musculoskeletal neck pain" and prescribed physical therapy. [R. 247].

---

[2] There do not appear to be any medical records pertaining to this hospitalization in the administrative record.

On September 2, 2010, Ms. King established a primary care relationship with Dr. Kristen Remus, D.O., at Beth Israel Deaconess Medical Center ("BIDMC"). [R. 266-67]. Dr. Remus' treatment notes from Ms. King's first visit states that Ms. King had "no major medical problems." [R. 267]. Dr. Remus goes on to acknowledge, however, that Ms. King reported "musculoskeletal pains" in her left hip and neck, and that she reported occasional problems with her knees and wrist. Ms. King further reported that her hands sometimes go numb when using the computer for long periods. [R. 267-68]. Dr. Remus also noted that Ms. King "reports she has a history of untreated anxiety disorder." [R. 268]. Dr. Remus performed a physical exam of Ms. King, noting that she did not appear to be in any distress and was well-dressed and well-groomed. [R. 270]. Ms. King had full range of motion in her neck, but Dr. Remus noted tenderness in her right trapezius muscle and her left hip. [R. 271]. Dr. Remus reported that Ms. King's "[j]udgment and insight" appeared to be normal, and that she did not appear "overly anxious." [Id.]. Dr. Remus also reviewed some of Ms. King's prior medical records, which included Dr. Patel's evaluation for PTSD.[3] Dr. Remus further noted that Ms. King had "multiple joint pains" of a "musculoskeletal nature." She suspected a trapezius strain and possibly a pelvic girdle strain. Although she did not request X-rays, Dr. Remus did refer Ms. King for physical therapy for her neck and hip. [R. 273]. With respect to Ms. King's anxiety and PTSD, Dr. Remus suggested that Ms. King see a therapist. Ms. King declined. Dr. Remus noted that she "did not find [Ms. King's] condition to be limiting of her daily activities," and opined that she did not require medication at that time. [Id.]. Dr. Remus' overall impression and plan was that Ms. King

---

[3] Based on Dr. Remus' description of the prior medical records, it appears that some of them are included in the administrative record, while others are not. [R. 272].

was a "46-year-old woman who has some complicated medical problems over the years as well as a history of trauma . . . ." [Id.].

Ms. King was evaluated by a physical therapist on September 27, 2010, although the record does not contain any substantive physical therapy notes or clinical follow-up. [R. 275-76]. Also on September 27, 2010, Ms. King met with Elizabeth Simpson, a licensed clinical social worker affiliated with BIDMC. [R. 275]. Ms. King reported to Ms. Simpson that she has a history of PTSD and anxiety dating back to the 1980s, when she was stalked by a man. [R. 276-77]. Although she had obtained a restraining order, Ms. King reported a recurrence of her symptoms in 2003, after a traumatic experience during a hospital visit. Ms. King also reported that when she met with Ms. Simpson, her anxiety was particularly high, because her mother had just had a stroke and was currently in the hospital. Ms. King stated that her anxiety and PTSD produce symptoms including a "startle reflex," nightmares, difficulty concentrating, and difficulty with affect regulation, particularly anger management. [R. 277]. At that time, Ms. King had recently started taking Clonazepam, prescribed by Dr. Remus. Ms. Simpson described Ms. King at the time of her visit as "neatly and casually dressed and appropriately groomed." However, she noted that her mood was "a little anxious," and that she was verging on tears at some point. Her insight and judgment appeared very good. [R. 279]. Ms. Simpson established a plan to continue seeing Ms. King weekly, for 45-minute therapy sessions. [R. 280].

Ms. King next met with Ms. Simpson on October 2, 2010. Ms. King arrived late and informed Ms. Simpson that her mother had passed away the previous week. Ms. King explained that she was experiencing significant stress and frustration. [R. 283-84]. The next week, Ms. King called Ms. Simpson to cancel her therapy session. She also requested a psychiatric evaluation. [R. 284].

On October 20, 2010, Ms. King was seen and evaluated at BIDMC after having a panic attack when she locked herself out of her apartment. At that time, Ms. King was still a patient of Dr. Remus, and was still taking medication for her anxiety and PTSD. She had plans to establish care with a psychiatrist in the "near future." [R. 245].

On November 9, 2010, Ms. King was seen by Dr. Anton Pesok, MD, at BIDMC for a psychiatric evaluation. [R. 291-94]. He noted that she was ten minutes late for her appointment, and appeared "tense" at first, but "eased up a little" as the visit progressed. She was casually dressed and well groomed, but her affect was "restricted" and she had nervous laughter at times. Her speech was "slightly pressured," and her thought process was "somewhat tangential." [R. 292-93]. His impression notes suggest that although Ms. King reported a long history of PTSD and anxiety, there were "some aspects of her presentation" that made him "concerned that perhaps there are other problems outside the realm of PTSD." Her "tense affect" and the way she presented made him "think about the necessity to rule out thought disorder." [R. 293]. Dr. Pesok indicated that he would need to meet with Ms. King more frequently.

Ms. King met with Dr. Pesok again on November 30, 2010. [R. 295-96]. Ms. King was 15 minutes late to the appointment. [R. 296]. Ms. King reported that she was going to be evicted from her apartment, and that she continued to struggle with anxiety, insomnia, nightmares, hyper vigilance and irritability. She reported that she had previously lost her job with a temp agency (proofreading) when she was taken off her clonazepam medication. [R. 296]. Dr. Pesok's "treatment plan update" stated that Ms. King's symptoms were "consistent" with PTSD, but that some aspects of her history "do not match PTSD course." He also noted that he "[s]till can not rule out an underlying personality disorder and/or mood or psychotic disorder." [R. 297]. His

ultimate treatment recommendations were "still pending" at that time. [Id.]. There are no further treatment notes from Dr. Pesok in the administrative record.

On December 9, 2010, Ms. King saw Dr. Remus for a follow-up. Dr. Remus' treatment notes report Ms. King's mother had passed away in September, which "triggered her anxiety and depression." [R. 300]. Dr. Remus also explained that Ms. King began taking Clonazepam in late September 2010, and that she had established treatment relationships with Dr. Pesok and Ms. Simpson. During this visit with Dr. Remus, Ms. King reported that she had been continuing to read and write poetry as a therapeutic outlet. [Id.]. Ms. King also complained of migraine headaches, which she said induced nightmares associated with her PTSD. [R. 301]. Ms. King denied "severe worsening depression," stating that she was able to manage her symptoms "quite well" with clonazepam, but had noticed some "repetitive behaviors" that emerged during this recent period of increased stress. [Id.]. Dr. Remus' notes indicate that Ms. King's anxiety and mood were "somewhat well controlled," although she also noted that Ms. King was taking clonazepam up to three times per day. [R. 300-02]. Dr. Remus agreed that this dosage was "required" at that time, due to the stresses of Ms. King's social situation and her mother's recent death, but she told Ms. King that it would not be advisable to continue taking clonazepam at that frequency and dosage in the long term. [R. 302]. Dr. Remus also stated that she would "defer additional psychiatric diagnoses and recommendations to Dr. Pesok." [Id.].

Several days later, on December 13, 2010, Ms. King was examined by Dr. Rusell Kerbel, M.D., at BIDMC, for complaints of bilateral upper extremity tremors and numbness in her left hand. [R. 298]. By December 15, 2010, it appears that her symptoms had improved. [R. 298-99]. It is unclear whether Ms. King sought any follow-up treatment for these symptoms.

The administrative record also contains an opinion dated March 19, 2011, from Robert O. Sills, Ph.D., opining that Ms. King is "capable of performing physical and mental activities in a work setting." [R. 310].[4] In this opinion, Dr. Sills states that he first saw Ms. King for therapy sessions on January 25, 2011, and last saw her on March 15, 2011. [R. 310; see also R. 338]. The record, however, contains no treatment notes or other evidence from these sessions. His opinion further confirms that Ms. King suffers primarily from PTSD, but he notes that she has had "no hospitalizations" and an "unknown history of illness." [R. 311]. With respect to Ms. King's current mental status, Dr. Sills notes that her insight and judgment were good; she was oriented as to time and place; her short and long term memory were fine; cognition was good; but that her mood and affect suggested mild depression and mild anxiety. [Id.]. He opines that she "appears able to maintain healthy social relationships," and that she was "able to maintain daily responsibilities and leisure time activities." [R. 311]. He states that Ms. King had "no" deficits of concentration or attention that would interfere with timely task completion, or regular routine. [Id.]. He also states that Ms. King "get [sic] along with others well at work and at home;" that she "appears to have no trouble travelling in public;" and that she "appears to deal with routine stress in adaptive fashion." [R. 312]. He acknowledges, however, that psychological testing had not been performed, and that it was "unknown" whether she had ever been fired or resigned from jobs because of her psychiatric symptoms, or whether there were any other sources of information regarding Ms. King's condition. [Id.]. When asked about her ultimate prognosis, Mr. Sills stated: "Good." [R. 313]. He assigned her a GAF score of 60. [R. 311].

---

[4] The record is unclear as to whether Dr. Sills is a licensed clinical social worker, a licensed psychologist, or both. [R. 314, R. 345]. The record contains a treatment note from another doctor, which suggests that Ms. King saw Mr. Sills for psychotherapy. [R. 338].

On April 20, 2011, Dr. Remus was also asked to provide an opinion regarding Ms. King's ability to do work-related physical and mental activities, despite her functional limitations. [R. 330]. Dr. Remus noted that she first saw Ms. King in September 2010, and that Ms. King had described a longstanding history of anxiety and PTSD. [Id.]. Dr. Remus noted that Ms. King's "symptoms worsened, and she was evaluated by Dr. Anton Pesok of our Psychiatry Division." [Id.]. In Dr. Remus' opinion, Ms. King's "anxiety symptoms do seem to impair her functionality," but it was "unclear if she is unable to sustain meaningful employment because of this." Dr. Remus expressly "defer[red] to a psychiatrist regarding this decision." [Id.]. Notably, the administrative record does not reflect any evaluation or opinion from Dr. Pesok, nor does it reflect that the SSA requested any such opinion from him.

Finally, the administrative record contains a "Mental Impairment Questionnaire" dated April 6, 2012, which was completed by Mr. Benjamin Kudler (Ms. King's licensed clinical social worker), and co-signed by Dr. Erwin Ilano (Ms. King's psychiatrist). [R. 375-81]. In this opinion, Mr. Kudler and Dr. Ilano noted that Ms. King had been seen for weekly psychotherapy since November 2, 2011 for a primary diagnosis of PTSD. [R. 376].[5] The clinical findings stated in the opinion are that Ms. King's "affect, speech, and thought patterns" are impacted by her anxiety, and that her outward presentation "belies the severity" of her panic and anxiety. [Id.]. Her reported symptoms included, but were not limited to, "generalized persistent anxiety . . . mood disturbance . . . difficulty thinking or concentrating . . . persistent disturbances of mood or affect . . . recurrent severe panic attacks manifested by a sudden unpredictable onset of intense

---

[5] The record, however, does not contain any treatment notes, medical records, or other evidence relating to Ms. King's treatment with Dr. Ilano and/or Mr. Kudler at Fenway Health.

apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." [R. 377].

Notably, Mr. Kudler and Dr. Ilano opined that Ms. King was "seriously limited" in her ability to maintain attention for two hours, remember work-like procedures, understand and remember short and simple instructions, and sustain an ordinary routine without special supervision." [R. 378]. They found that she was "unable to meet competitive standards" with respect to carrying out short and simple instructions, maintaining regular and punctual attendance, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, and asking simple questions or requesting assistance. [Id.]. Finally, the treating sources found that Ms. King had "no useful ability to function" with respect to performing at a consistent pace without excessive rest; accepting instructions and responding to criticism; getting along with co-workers; and dealing with normal work stress. [Id.]. The opinion notes that in Ms. King's most recent job, she experienced "profound distress, crying spells, dissociation at work and disruption in sleep, appetite, and most other areas of functioning . . . ." [Id.]. Mr. Kudler and Dr. Ilano opine that Ms. King "would have immense problems with interpersonal relationships and conflict resolution," as she "becomes easily flustered [and] overwhelmed and cannot reliably complete regular work tasks, especially those involving interaction with others." [Id.].

When asked to evaluate the degree of Ms. King's functional limitations, Mr. Kudler and Dr. Ilano opined that she would have "marked" limitations with respect to activities of daily living, and in maintaining concentration, persistence or pace. [R. 380]. They found that she would have "extreme" limitations with respect to maintaining social functioning, and that she had experienced four or more episodes of decompensation during a 12-month period. [Id.]. The

treating sources further stated that Ms. King's impairments would be expected to last 12 or more months. [R. 381].

### 2.   Non-Treating Sources

The record also contains reports from a consulting clinical psychologist, who met with Ms. King in connection with her application for SSI, and two review psychologists employed by the Social Security Administration, who reviewed Ms. King's case file.

On July 13, 2011, Ms. King attended a psycho-diagnostic interview with Steven N. Broder, Ph.D., in connection with her pending application for SSI benefits. [R. 343].[6] Dr. Broder's primary diagnosis was post-traumatic stress disorder, although he noted that Ms. King had "multiple medical problems," including migraines, insomnia, and osteoarthritis." [R. 349]. During the interview, Ms. King reported that she currently lived in Arlington with a housemate, with whom she "gets along." [R. 346]. She stated that she usually gets up around 9:00am, makes coffee, and checks all the doors to make sure they are locked. [R. 356-47]. She reported spending time at local libraries, and mentioned participating in an "extensive online artistic community" related to literature and poetry. She also stated that she watches a couple hours of TV during the day, and that she "tries to read." [R. 347]. She noted that she does not cook, although she generally eats three times per day. She stated that she was able to take public transportation, and was able to perform housework. She could shop in a store by herself without assistance. [Id.]. With respect to Ms. King's mental status, Dr. Broder observed that she initially became "upset" when he asked for paperwork that she did not have. [R. 348]. However, Ms. King spoke "without pressure," and was "talkative." She was "articulate and easy to understand." [Id.] She did

---

[6] By this time, Ms. King's initial request for benefits had been denied, and she had submitted a Request for Reconsideration.

indicate, however, that she has difficulty making decisions, and that she gets "angry" when she interacts with people. Although she denied being depressed, Ms. King reported that she has crying spells once a week, such as when she feels overwhelmed in the grocery store. [Id.]. She also reported an exaggerated "startle response," and noted that she had been scared by someone in the waiting room. [Id.]. Dr. Broder observed that Ms. King's thoughts "seemed to come quite quickly," but that she did not show signs of a formal thought disorder. [R. 349]. He also noted that she was somewhat confused as to the current date. [Id.]. She could recall two of three items Dr. Broder asked her to remember twenty-five minutes before. [Id.]. Dr. Broder ultimately assigned Ms. King a GAF score of 60-70. He also noted that it was "unlikely" she would return to her previous job as a writing instructor. [R. 350].

On April 1, 2011, Therese Harris, Ph.D. was consulted to complete a Psychiatric Review Technique of Ms. King's medical history from September 27, 2010 to September 27, 2011. [R. 316].[7] She found that Ms. King suffered an "impairment," namely, affective disorders and anxiety-related disorders, but she found that these impairments were "not severe." [Id.]. She found that Ms. King's affective disorders included a "grief reaction per [treating source], [R. 319], and that she suffered from anxiety, as evidenced by "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." [R. 321]. But she opined that Ms. King had only "mild" limitations in terms of restrictions of activities of daily living; difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace. [R. 326]. She found that Ms. King had experienced no episodes of decompensation of extended duration. [Id.]. She further opined that Ms. King's statements regarding her limitations are "stronger than [treating source] evidence indicates." [R. 328]. However, the only "treating

---

[7] Dr. Harris did not examine or treat Ms. King.

14

source" referenced in Dr. Harris' consultant notes is Mr. Sills' March 19, 2011 evaluation. [Id.]. Dr. Harris' report does not address any treating source records from Ms. King's treating physicians, such as Dr. Remus or Dr. Pesok.[8]

On September 9, 2011, Nancy Keuthen, Ph.D., was consulted for a second Psychiatric Review Technique. [R. 352]. Like Dr. Harris, she reviewed Ms. King's file, and found that although Ms. King suffered from mental impairments, namely anxiety-related disorders, those impairments were not "severe." [Id.]. She also found that Ms. King experienced only mild functional limitations. [R. 362]. Further, although Ms. King had alleged multiple limitations on her function report, Dr. Keuthen found her be only "partially credible" in this regard, because her prior treating source report [Dr. Sills] and her current consultative evaluation from Dr. Broder "do not provide corroboration of alleged functional severity." [R. 364].

### D.  Procedural History

Ms. King submitted an application for SSI on December 3, 2010, alleging that she became disabled on September 27, 2010. [R. 125]. After Ms. King's initial application for SSI was denied on April 29, 2011, [R. 65], she submitted a Request for Reconsideration. [R.70]. In connection with that appeal, Ms. King submitted an additional Function Report dated June 24, 2011 [R. 192-99], in which she indicated that her symptoms were worsening. She stated that her anxiety was getting progressively worse, and she was having more panic attacks. [R. 197]. She complained of increasing migraines, back pain, and insomnia, and noted that her memory and concentration problems were worsening as well. [R. 193, 197-99]. Her Request for Reconsideration was denied on September 12, 2011. [R. 66, 72]. After the second denial, Ms.

---

[8] Dr. Harris' assessment was affirmed by Dr. Barbara Scolnick, M.D., on August 11, 2011. [R. 351], although Dr. Scolnick's evaluation report contains no substantive notes or reasoning.

King requested a hearing in front of an Administrative Law Judge ("ALJ"). [R. 75]. Her request was granted, and an administrative hearing took place before the ALJ on October 12, 2012. [R. 27-64].

### 1. The Administrative Hearing

On October 12, 2012, Ms. King appeared and testified at the hearing, where she affirmatively waived her right to representation and elected to proceed pro se. [R. 29-30]. Ms. King testified that she last worked in May of 2011, when she finished teaching the one-semester college writing course. Although she had previously "quit teaching" in 2004, she found herself in need of money and a new place to live after her mother passed away in the fall of 2011. She testified that she "took the first job that was offered" to her. Ms. King described how her anxiety lead to a "bad interaction" with a co-worker in a staff meeting at the college, which prevented her from attending any further mandatory staff meetings. Ms. King also explained that as a result of her stress and anxiety, it would generally take her three to four days to prepare a two-hour lesson plan. [R. 33].

At the hearing, the ALJ asked Ms. King to confirm that her diagnosis was "psychological and emotional issues." Ms. King replied "Yes." [R. 35]. When the ALJ asked her if she had any other medically determinable impairments, she noted that she had migraines, as well as problems with her musculoskeletal system and degenerative osteoarthritis. [R. 35-36]. Ms. King explained that these problems were manifesting themselves through a strained ligament in her neck, and that she has problems with her shoulders and back if she sits at a computer for more than a couple of hours. [R. 36]. She also mentioned problems with her knee, and she testified that she has had physical therapy, including physical therapy for her back. [Id.]. When the ALJ asked her if she had any limitations on walking, sitting, or standing, Ms. King responded affirmatively. [R.

39-40]. She stated that on a good day, she might be able to walk for half an hour, but on a bad day, she couldn't even walk around the corner to the pharmacy. [R. 40]. The ALJ asked whether Ms. King had received a diagnosis for her back and knee, and she replied that she has had physical therapy "on and off" for years, and that her primary care physician had prescribed it. [R. 40-41]. The ALJ asked her whether there was an official diagnosis, or any MRIs in the record. [R. 41]. Ms. King replied that she didn't think so – she couldn't recall if her primary care doctor had taken x-rays or "anything like that." [Id.]. Ms. King noted, however, that she is "not supposed to lift more than five to seven pounds," and was "not allowed to carry my book bag" any longer, because "everything acts up," including her neck and back. [Id.]. The ALJ did not explore who imposed those limitations.

With respect to her mental health problems, Ms. King testified that she sees her therapist every week, and her psychiatrist every three to four months. [R. 37].[9] Ms. King confirmed that she was taking medication for her psychological and emotional issues, and she testified that there are side effects from these medications, specifically, that she feels like a "zombie" the day after she takes them. [R. 38-39]. She stated that some mornings, it takes her until 12:00p.m. before she is able to move around, read, or concentrate on anything. [R. 39].

With regard to social interactions, Ms. King testified that her family has not spoken with her since she moved out of her late mother's house, [R. 42], and that she socializes with friends less frequently than she did before. In addition, she has stopped going to the computer lab because she cannot tolerate any conflict with other people. [R. 42]. As of May 2012, she stopped going to poetry readings, which she used to enjoy. [R. 43]. Ms. King described increasing

---

[9] At the time of the administrative hearing, it appears that Ms. King was undergoing medical treatment and therapy sessions at Fenway Health, in the care of Dr. Ilano and Mr. Kudler.

difficulties interacting with others. She reported that she has difficulty concentrating on a conversation, [R. 50], and that she has an aversion to conflicts. [Id.]. She testified that she might be able to work and interact with a supervisor, assuming there were no interpersonal conflicts, and interactions remained superficial. [R. 51].

Ms. King testified that when she is home, she still performs chores, but that her physical therapist had told her not to vacuum for two weeks, due to her back pain. [R. 44]. She is still able to leave the house to do shopping or errands, but she cannot carry two bags of groceries at once. [R. 45]. She also takes the bus to medical appointments. [R. 46]. Ms. King testified that she is able to sleep through the night with her medication. [R. 46-47].

At the hearing, the ALJ also elicited testimony from a Vocational Expert ("VE"), Dr. James Scorzelli. [Id. 53-64]. The ALJ asked the VE to identify and classify the past work Ms. King had performed over the course of her career, according to the Social Security Administration's regulatory definitions of vocational preparation levels and exertional strength factors. [R. 54-55]. The VE noted that most of Ms. King's previous jobs had been "sedentary," and either semiskilled or skilled. [R. 56].

The ALJ then asked the VE to assume a person of Ms. King's age, education, and experience, who is "able to perform at the light level," and whose work would be isolated with only occasional supervision. [R. 56]. He also asked the VE to assume that the person in question required a "low-stress" job, meaning a low production rate or pace. [R. 59]. He asked the VE whether an individual with such limitations could perform Ms. King's past relevant work. The VE testified that although all of Ms. King's past relevant work would have been performed at the light or sedentary levels, the ALJ's stated limitations on personal interactions and requirements of low-stress would "eliminate all her past work." [R. 61]. The VE, however, also testified that a

person with such limitations could perform other jobs, including a photographic mounter, an electronic bonder, and a touch-up screener, and that all of those jobs exist in significant numbers in the state and national economies. [R. 61-62].

After the VE's testimony, Ms. King was given an opportunity to ask questions and provide further comments. Ms. King noted that she had been able to maintain her prior jobs because she was, at one time, highly accurate. But she went on to explain that she is no longer able to perform at that level of accuracy, or with the same attention to detail. [R. 62-63].

## 2. The ALJ's Decision

On October 26, 2012 the ALJ issued a decision denying Ms. King's application for SSI benefits. [R. 13-26]. In reaching this conclusion, the ALJ performed the five-step sequential evaluation required by 20 C.F.R. § 416.920. First, he found that Ms. King had not engaged in substantial gainful activity since the date of her application for SSI [R. 18]. Moving on to step two, the ALJ found that Ms. King had a "severe impairment," namely, "anxiety-related disorder." [Id. (citing 20 C.F.R. § 416.920(c) *et seq.*)]. The ALJ did not provide any discussion regarding this finding, nor did he address any of Ms. King's alleged physical impairments. [See id.]. At step three of the analysis, the ALJ found that Ms. King did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 18].  Again, the ALJ focused exclusively on Ms. King's "mental impairments," and he concluded that while they presented Ms. King with mild to moderate difficulties in the areas of daily living; social functioning; and concentration, persistence or pace, these impairments did not cause "marked" difficulties. [R. 18-19]. The ALJ also found that Ms. King has not experienced any episodes of decompensation that were of extended duration. [R. 19]. Having found that Ms. King did not have an impairment or

19

combination of impairments that met the conditions listed in the Social Security regulations, the ALJ proceeded to the fourth step of the analysis.

At step four, the ALJ found that despite Ms. King's anxiety-related disorder, she had the residual functional capacity to perform a "full range of work at all exertional levels," with some non-exertional limitations arising out of her mental impairments. [R. 19]. Specifically, the non-exertional limitations adopted by the ALJ were as follows: Ms. King can have no more than superficial interactions with the general public, co-workers and supervisors, she cannot perform work with production or pace requirements, she cannot be given deadlines, and she can work only in a low-stress environment. [Id.].

The ALJ noted that in making this step-four finding, he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [Id.]. He also stated that he had considered the medical opinion evidence of record, as required by the social security regulations. [Id.]. The ALJ's decision, however, specifically discussed only the following medical evidence: First, he noted that on September 2, 2010, Dr. Remus opined that although Ms. King's anxiety symptoms "do seem to impair her functionality," it was unclear whether they would prevent her from sustaining meaningful employment. [R. 20]. Doctor Remus expressly stated that she would "defer to a psychiatrist" on this point. [See id.; see also R. 330]. Second, the ALJ referenced the report of Stephen N. Broder, Ph.D., who had conducted a consultative examination of Ms. King on July 13, 2011. [R. 20]. Dr. Broder's primary diagnosis was PTSD, and his report contained a number of observations regarding Ms. King's behavior and responses during the interview. The ALJ also noted that Dr. Broder assigned Ms. King a GAF score of between 60 and 70. [R. 20; see also R.

350].[10] Next, the ALJ noted that Ms. King was seen in the emergency room of a local hospital on

September 15, 2011, for evaluation of increased anxiety. [R. 20]. The ALJ did not, however,

specifically discuss or explain the import of these various medical opinions.

The ALJ then concluded that Ms. King's medically determinable impairment (i.e., her

anxiety-related disorder) could reasonably be expected to cause her alleged symptoms, but that

Ms. King's allegations concerning the intensity, persistence and limiting effect of these

symptoms were "not credible to the extent they are inconsistent with the above residual

functional capacity assessment." [R. 20].

In reaching his conclusions, the ALJ also stated that he had considered the opinion of Mr.

Benjamin Kudler, Ms. King's licensed clinical social worker, and Dr. Erwin Ilano, Ms. King's

treating psychiatrist. [R. 20-21; see also R. 375]. Ultimately, the ALJ determined that he "[could

not] give this opinion great weight," because it was "not supported by objective medical

evidence, nor is it consistent with the weight of the evidence of record." [R. 21]. The ALJ did not

further elaborate on those conclusions. As an additional reason for rejecting the Kudler/Ilano

opinion, the ALJ noted that the document was "internally inconsistent," because although Mr.

Kudler and Dr. Ilano cited "severe limitations in [Ms. King's] functioning," they ultimately

assigned her a GAF score of 58. [Id.]. The ALJ reasoned that because a GAF score in this range

"does not support a finding that functioning is precluded, or even severely limited," Mr. Kudler

and Dr. Ilano's opinion was internally inconsistent. [Id.].

At step five of the analysis, the ALJ found that Ms. King's residual functional capacity

meant she was capable of performing her past work as a database clerk. [R. 21-22]. In support of

---

[10] Dr. Broder was not a treating physician; Ms. King was referred to him for a Psychodiagnostic
Interview in connection with her application for SSI.

this conclusion, the ALJ stated that at the administrative hearing, the vocational expert "testified that [Ms. King's] residual functional capacity does not preclude the performance of the work of a data base clerk."[11] [R. 21]. The ALJ stated that he would accept the testimony of the VE in this regard. [Id.]. In addition, the ALJ made an alternative step-five finding that, in addition to performing her past relevant work as a data base clerk, Ms. King was also capable of performing a number of other jobs in the state and national economy. [R. 21-22]. These jobs include: photographic mounter, electronic bounder, and touch-up screener. [R. 22]. As a result of these alternative findings at step five, the ALJ found that Ms. King was not disabled. [Id.].

### 3. Ms. King's Appeal

Ms. King subsequently requested review of the ALJ's decision by the Appeals Council. [R. 7]. The Appeals Council denied Ms. King's request for review on November 20, 2013. [R. 1], thereby making the ALJ's decision the final decision of the Commissioner. See 20 C.F.R. § 416.1481. On February 6, 2014, Ms. King filed her Complaint with this Court. [ECF No. 1].[12]

In her Complaint [ECF No. 1] and Motion to Reverse the Commissioner's Decision [ECF No. 26], Ms. King appears to advance two arguments. First, she argues that the ALJ's decision should be reversed because it was not supported by substantial evidence. Specifically, Ms. King suggests that the ALJ improperly discounted the opinion of her treating psychiatrist and licensed clinical social worker, and improperly relied upon other medical evidence. She also suggests that

---

[11] As Ms. King points out, the ALJ appears to misstate the Vocational Expert's conclusions in this regard. In fact, the VE testified that the ALJ's stated limitations would eliminate all of Ms. King's prior relevant work. [R. 61].

[12] Although Ms. King filed her Complaint outside of the sixty-day time period within which to institute a civil action to appeal the Commissioner's decision, see 20 C.F.R. § 422.210(c), the Appeals Council retroactively extended the time period for appeal through February 6, 2014, [see ECF No. 19, 5], thereby rendering Ms. King's Complaint timely.

the ALJ ignored her physical impairments and focused only on her mental health issues. Second, Ms. King suggests that the case should be remanded because the Social Security Administration allegedly lost some of the medical records and other documents Ms. King submitted in support of her application. As a result, the ALJ never considered those documents in connection with his decision. Ms. King has submitted copies of the allegedly lost documents to the Court along with her Complaint. [ECF No. 1].[13]

On June 12, 2015, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner [ECF No. 28], along with a Memorandum in Support [ECF No. 29]. The Commissioner argues that the decision must be upheld, because it is supported by substantial evidence and applies the correct legal standard. The Commissioner further argues that Plaintiff is not entitled to a remand to consider the additional medical records and documents attached to her Complaint.

III.    **STANDARD OF REVIEW**

This Court has jurisdiction pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of Section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a

---

[13] Notably, among these documents are treatment records from Dr. Ilano and Mr. Kudler, which do not appear in the administrative record. Also included in these documents are treatment notes and physical therapy evaluation summaries relating to Ms. King's neck and low back pain. These records are also not within the administrative record currently before the Court.

rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may…at any time order additional evidence to be taken before the Commissioner…but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

To the extent that Ms. King argues the Commissioner's decision must be reversed because it was not supported by substantial evidence of record, that argument is governed by Section 205(g), sentence four. In contrast, to the extent Ms. King argues that this case should be remanded for consideration of the additional documents she submitted with her Complaint, that argument would be governed by the standards set forth in Section 205(g), sentence six.

Because the Court agrees with Ms. King that the Commissioner's decision was not supported by substantial evidence, the Commissioner's decision will be reversed pursuant to Section 205(g), sentence four, and remanded so that certain aspects of the administrative record may be developed more fully. In light of this conclusion, the Court finds it unnecessary to reach Ms. King's sentence-six argument regarding the allegedly lost records. On remand, Ms. King

may present those documents to the Social Security Administration for consideration in the first instance.

## IV.   ANALYSIS

Under Section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Commissioner of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence…but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)).

### A.  Rejection of a Treating Source Opinion

Ms. King first argues that the ALJ's decision was not supported by substantial evidence, because he improperly rejected the opinion of Ms. King's licensed clinical social worker and treating psychiatrist, and relied on other medical opinions of record to support his conclusion that Ms. King was not disabled. The opinion in question is a "Mental Impairment Questionnaire" that was completed by Mr. Kudler (Ms. King's licensed social worker), and co-signed by Dr. Erwin

Ilano (Ms. King's psychiatrist) on April 6, 2012.[14] The Court agrees that the ALJ did not provide

adequate reasons for rejecting the Kudler/Ilano opinion, and further finds that the medical record

was not adequately developed.

"[T]reating physicians' opinions are ordinarily accorded deference in Social Security

disability proceeding," Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 n.9 (1st Cir.

2010), because "these sources are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations." 20 C.F.R. § 416.927(c)(2). Thus, a treating-source opinion is entitled to

controlling weight, if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the

claimant's] case record . . . ." 20 C.F.R. § 416.927(c)(2). If the treating-source opinion conflicts

with other opinions in the record, however, the ALJ is entitled to resolve those conflicts and

"may reject the opinion of the treating physician so long as an explanation is provided and the

contrary finding is supported by substantial evidence." Tetreault v. Astrue, 865 F. Supp. 2d 116,

125 (D. Mass. 2012) (internal quotations and citation omitted). SSA regulations state that an

administrative law judge must give "good reasons" for rejecting a treating source's opinion. See

---

[14] Where a treating acceptable medical source co-signs a non-acceptable medical treating
source's opinion, the resulting opinion constitutes that of both sources. Wysocki v. Colvin, No.
CIV.A. 13-30188-MGM, 2014 WL 6485887, at *2 n. 1 (D. Mass. Nov. 19, 2014).

20 C.F.R. § 416.927(c)(2); Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012) (unpublished).

Here, the ALJ provided three reasons for rejecting the Kudler/Ilano opinion. First, he found that their opinion was "not supported by objective medical evidence." Second, the ALJ found that their opinion was "inconsistent with the weight of the evidence of record." Third, the ALJ found that the Kudler/Ilano opinion was "internally inconsistent," because although they opined that Ms. King had "severe" limitations in functioning, they assigned her a GAF score of 58. [R. 21]. The Court will address each of these reasons in turn.

### 1.   Lack Of Objective Medical Evidence to Support Opinion

The ALJ did not elaborate on his finding that the Kudler/Ilano opinion was "not supported by objective medical evidence." [R. 21]. Thus, the Court will assume that the ALJ was referring to the lack of treatment notes or other medical records from Mr. Kudler and Dr. Ilano to support their opinion about the severity of Ms. King's impairments. After reviewing the record, the Court agrees that such evidence is missing. The record, however, is also conspicuously underdeveloped on this point, and the Court finds it necessary to remand the case to the Commissioner for further factual development and reconsideration of the ultimate issues.

Because Social Security proceedings are not strictly adversarial in nature, the Secretary has a "duty to develop an adequate record from which a reasonable conclusion can be drawn." Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (internal quotations and citation omitted). "[T]his responsibility increases in cases where the [claimant] is unrepresented, where the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of the administrative law judge, without undue effort, to see that the gaps are somewhat filled . . . ." Currier v. Sec'y of Health, Ed. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980). The First Circuit has also held that the

Secretary's duty "is even greater when the claimant is obviously mentally impaired." Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 81 (1st Cir. 1982). "If the ALJ fails to fill those evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate." Mickevich v. Barnhart, 453 F. Supp. 2d 279, 287 (D. Mass. 2006) (citation omitted).

Here, the record before the ALJ strongly suggested that there were significant gaps in the evidence – specifically, missing treatment records from Dr. Ilano and Mr. Kudler. The opinion submitted by these treating sources indicated that Ms. King had been undergoing weekly psychotherapy treatment at Fenway Health for some time. [R. 369]. In addition, Ms. King lists Mr. Kudler and Dr. Ilano as medical providers in documents she submitted to the SSA in support of her claim for benefits. [See R. 226-27; 234-36 (listing Kudler and Ilano amongst current medical providers); R. 230, 238 (indicating that Dr. Ilano had prescribed her medication for her PTSD, insomnia, and anxiety)].

In light of these apparent gaps, the ALJ should not have rejected these treating sources' opinion as unsupported by objective medical evidence, without making further efforts to obtain that missing evidence. "If the evidence does not support a source's opinion and the ALJ cannot ascertain the basis for the source's opinion, the ALJ has an obligation to 'make every reasonable effort' to recontact the source for clarification." Gaeta v. Barnhart, No. CIV.A. 06-10500-DPW, 2009 WL 2487862, at *5 (D. Mass. Aug. 13, 2009) (quoting Social Security Ruling 96–5P, 1996 WL 374183, at *6 (July 2, 1996). "Specifically, the ALJ must recontact the treating doctor when the doctor's records are inadequate, contain conflict or ambiguity, do not appear to be based on medically acceptable diagnostic techniques, or appear incomplete." Id. "The ALJ may carry out this duty by seeking additional evidence or clarification from the source, telephoning the medical provider, or requesting copies of the records, a new report, or more detailed report." Id.  Here,

the record does not indicate that the Social Security Administration or the ALJ ever contacted

Dr. Ilano and Mr. Kudler or attempted to obtain treatment records from Fenway Health.

Further, the failure to pursue these records was prejudicial to Ms. King's case. See Gaeta,

2009 WL 2487862, at *6, n. 4. One can demonstrate such prejudice by "showing that additional

evidence would have been produced if the ALJ had fully developed the record, and that the

additional evidence might have led to a different decision." Id. (quoting Newton v. Apfel, 209

F.3d 448, 458 (5th Cir. 2000). Here, Ms. King has attached a number of documents to her

Complaint.[15] Among those documents are treatment records from Dr. Ilano and other mental

health providers at Fenway Health, which pre-date the hearing before the ALJ, and which

arguably support the rejected opinion. [See, e.g., ECF No. 1, 31-45]. Although the Court is not at

liberty to consider these records on appeal, as they are not part of the administrative record, it

seems likely that these records could have been easily obtained, had the Commissioner made

independent efforts to obtain a complete medical file from Fenway Health. Further, because part

of the reason the ALJ rejected the Kudler/Ilano opinion was the lack of objective support, it

appears that the inclusion of such records may have led to a different decision. See Murphy v.

Astrue, No. CIV.A. 11-10634-JLT, 2012 WL 1866288, at *12 (D. Mass. Apr. 10, 2012), report

and recommendation adopted, No. CIV. 11-10634-JLT, 2012 WL 1866373 (D. Mass. May 21,

2012).

The Commissioner's failure to develop an adequate record is grounds for reversing the

Commissioner's decision pursuant to sentence four of Section 205(g), and ordering the case

---

[15] These documents are the records Ms. King claims that the SSA "lost." Because the Court
concludes that the Commissioner did not discharge her independent duty to develop the
evidentiary record, the Court need not decide whether or not Ms. King did or did not submit
these documents to the SSA in the first instance, or whether a remand is separately warranted
under Section 205(g), sentence six.

remanded for further proceedings. See Akopyan v. Barnhart, 296 F.3d 852, 857 (9th Cir. 2002);

see also Melkonyan v. Sullivan, 501 U.S. 89, 101 (1991) (noting that a judgment pursuant to

Sentence Four can be accompanied by a remand order); Freeman v. Barnhart, 274 F.3d 606, 610

(1st Cir. 2001) (holding that remands for additional development of the record could be ordered

under "either sentence" of Section 405(g)).

### 2.   Opinion Inconsistent With the Weight of the Evidence of Record

It follows that the ALJ's second reason for rejecting the Kudler/Ilano opinion is also

deficient. Because the medical record was not adequately developed, the ALJ's conclusion that

the Kudler/Ilano opinion was "inconsistent with the weight of the evidence" cannot stand. On

remand, and after additional evidence is gathered, it will be for the Commissioner to evaluate

and weigh the evidence anew.

### 3.   Internal Inconsistency – GAF Score

The ALJ cited a third reason for rejecting the Kudler/Ilano opinion, namely, that it was

"internally inconsistent." Specifically, although these treating sources opined that Ms. King had

"severe limitations" in functioning, they assigned her a GAF score of 58, which normally

suggests only "moderate" limitations. [R. 21].[16] The ALJ reasoned that while a GAF score "in

---

[16] GAF stands for the "Global Assessment Functioning" scale, which is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning at the time of evaluation. See Gagnon v. Astrue, No. 1:11-CV-10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012). "[GAF] scores may be of help in assessing functional ability, although they are not determinative." Id. (internal quotation and citation omitted). Under previous versions of the APA's Diagnostic & Statistical Manual of Mental Disorders, a GAF score between 51 and 60 would be consistent with moderate symptoms and "moderate difficulty in social, occupational, or school functioning. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 31 (4th ed.1994); see also Gagnon, 2012 WL 1065837, at *5.

this range reflects some limitations, it does not support a finding that functioning is precluded, or even severely limited." [Id.].  In short, the ALJ appears to have rejected the Kudler/Ilano opinion in part because they assigned Ms. King a GAF score which, according to the GAF scale, suggests that her functional limitations were not of the severity described by the treating sources in their narrative findings.

This approach overstates the importance of GAF scores in the disability analysis. Indeed, the American Psychiatric Association has moved away from the GAF system in recent years. The newest version of the Diagnostic & Statistical Manual of Mental Disorders, published in May 2013, no longer uses the GAF score. See Navedo v. Colvin, No. CIV.A. 14-30015-KPN, 2014 WL 6983358, at *3 n.2 (D. Mass. Dec. 9, 2014).[17] Several courts have held that because a GAF score provides only "limited insight" into a claimant's ability to function, see Martinez v. Colvin, No. CIV.A. 13-30124-KPN, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014), a "superficial discrepancy between a GAF score and a treating source's assessment is not in and of itself a sufficient basis for according little weight to a treating source's opinion." Santiago v. Colvin, No. 14-CV-30034-KAR, 2015 WL 685738, at *4 (D. Mass. Feb. 18, 2015). Accord Hall, 18 F. Supp. 3d at 153 (holding that ALJ improperly dismissed treating source's opinion based on GAF score, and ignored treating source's findings that claimant's focus and memory were impaired due to stress, depression, and emotional dysregulation, and that problem-solving and goal directed action were "essentially beyond her capability."). See also Gagnon, 2012 WL 1065837, at *6 (noting that a GAF score "by itself may not be determinative," but holding that

---

[17] The Social Security Administration, however, has indicated that it will continue to consider GAF scores in disability cases. See Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (discussing SSA internal Administrative Memorandum No. AM–13066).

the ALJ's rejection of treating source's opinion was supported by other considerations). The Court concludes that on this record, it was erroneous for the ALJ to reject the Kudler/Ilano opinion on the basis of an inconsistent GAF score, particularly where the medical record was underdeveloped, and where the Commissioner failed to obtain records which, if pursued, may have provided information essential to interpreting the treating sources' GAF score and placing it into context.

In sum, the ALJ's three reasons for rejecting the Kudler/Ilano treating source opinion were not supported by substantial evidence, and this case will be remanded for further factual development in this regard.

### B.  The ALJ Failed to Discuss Ms. King's Alleged Physical Impairments.

In her Complaint in this action, Ms. King also refers to her alleged physical impairments, including muscle and nerve problems, insomnia, weight gain, left hip pain, and problems with her knees, wrist, and hands. She appears to argue that her physical problems are "material" to the disability analysis. [ECF No. 1, 1-2]. As Ms. King is proceeding pro se, the Court liberally construes these allegations as an argument that the ALJ failed to address Ms. King's alleged physical impairments in his decision. See Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997); Tefera v. Colvin, 61 F. Supp. 3d 207, 214 (D. Mass. 2014) (interpreting pro-se claimant's pleadings "to raise the strongest arguments that they suggest") (internal quotations and citation omitted).[18] The Court agrees that the ALJ's decision is deficient on this point. Although the record contains some evidence suggesting that Ms. King suffers from physical impairments as well as mental impairments, the ALJ failed to address this evidence anywhere in his opinion.

---

[18] In Ms. King's initial administrative appeal to the Appeals Council, she argued that "only my emotional disability" was referenced in the ALJ's decision, whereas her disability claim "included physical limitations too." [R. 7].

Indeed, he failed to make any express findings about whether or not Ms. King's alleged physical issues constituted a severe impairment.

In her initial application for SSI, Ms. King expressly claimed that she suffered from, among other things, degenerative osteoarthritis, acid reflux, and migraine headaches. [R. 148]. In her initial Function Report, Ms. King complained that her musculoskeletal problems and arthritis caused back, knee, hip, and neck stiffness or pain if she sits for too long, especially at a computer, and that she has to take long breaks. She also noted that kneeling, bending, squatting, lifting more than 7-10 pounds is a problem. [R. 171]. The list of medications that she submitted to the SSA reports that she takes ibuprofen for chronic neck/back pain, and that she has undergone physical therapy for these problems. [R. 230].

The record contains some medical evidence to support these statements. In 2006, Ms. King was seen at Massachusetts General Hospital for complaints of neck pain that was "persistent over several months." She was diagnosed with "musculoskeletal neck pain" and prescribed physical therapy. [R. 247]. In September 2010, one of Ms. King's treating physicians (Dr. Kristin Remus), stated that Ms. King had a "history of right-sided neck pain, which comes and goes," and that she "occasionally has problems with her knees and her wrist as well." [R. 268]. Dr. Remus also reported that Ms. King "is finding that sometimes her hands are numb when she is using her computer for long periods." [Id.]. Dr. Remus further noted that Ms. King presented with "multiple joint pains" which appeared to be of musculoskeletal nature, and that she was referring King for physical therapy of her neck and hip." [R. 273]. It appears that Ms. King was evaluated by a physical therapist on September 27, 2010, although the record does not contain any substantive physical therapy notes or clinical follow-up. [R.275-76].

Ms. King also complained about her musculoskeletal issues during the hearing before the ALJ. She testified that she has been diagnosed with degenerative osteoarthritis, and that she has problems with her shoulders and back if she sits for more than a "couple of hours." [R. 35-36]. She also stated that she is not supposed to lift more than 7-10 pounds, or run the vacuum, and that she has undergone physical therapy for her back. [R. 36]. The ALJ asked King whether there had been a diagnosis for her back and knee problems, [R. 40], noting that he did not see any MRIs in the record. [R. 40-41]. Ms. King said she didn't think so, but that she had been going to physical therapy for these problems on and off. [Id.]. The ALJ does not appear to have pursued this matter any further. For example, he did not inquire about who had prescribed the physical therapy, or ask whether King had therapy treatment records that had not yet been submitted.

Further, the ALJ did not discuss Ms. King's alleged physical impairments in his decision. His Step-Two findings state only that Ms. King "has the following severe impairment: anxiety-related disorder." [R. 18]. There is no mention of Ms. King's alleged physical impairments, nor any discussion of whether they were "severe." Likewise, at Step Four of his analysis, the ALJ determined that Ms. King had the residual functional capacity to perform "a full range of work at all exertional levels," with certain *non-exertional* limitations. [R. 19] (emphasis added).[19] Nowhere does the ALJ address whether Ms. King's alleged physical impairments do or do not

---

[19] The Social Security administration classifies residual functional capacity into five exertional categories – i.e., sedentary, light, medium, heavy, and very heavy work. See 20 C.F.R. § 416.967. Sedentary work involves lifting no more than 10 pounds at a time, and typically involves sitting, with occasional walking or standing. Id. "Light" work involves lifting up to 20 pounds at a time, with frequent lifting or carrying objects weighing up to 10 pounds. Jobs in this category may require "a good deal of walking or standing." Id. Medium work may require lifting up to 50 pounds, with frequent lifting or carrying of objects weighing up to 25 pounds. Id. Heavy work involves lifting up to 100 pounds, with frequent lifting or carrying of objects weighing up to 25 pounds. Id. "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. Id.

compromise her ability perform work at any exertional level. It is unclear to the Court whether the ALJ considered Ms. King's physical problems and determined them not to be severe, or whether the ALJ failed to consider them entirely. Consequently, the ALJ's decision is not sufficiently developed to allow for judicial review in this regard.

Because the Court is unable to determine whether the ALJ's decision is supported by substantial evidence, remand is required. "Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation." Crosby v. Heckler, 638 F. Supp. 383, 385-86 (D. Mass. 1985). Furthermore, when determining whether a claimant's mental or physical impairment(s) are "of a sufficient medical severity" that they rise to the level of disability, the Commissioner must consider "the combined effect" of all a claimant's impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. 416.923. Although the ALJ found that Ms. King had a severe mental impairment, he erroneously failed to discuss whether Ms. King's alleged physical problems, in combination with her mental limitations, gave rise to any further limitations. See Matta v. Barnhart, No. CIV.A. 06-30150KPN, 2007 WL 4197493, at *6 (D. Mass. Nov. 20, 2007) (finding that ALJ erred by failing to address claimant's alleged migraine headaches in combination with her other impairments, and remanding for further proceedings). Thus, this action must be remanded for additional proceedings and written findings regarding Ms. King's alleged physical impairments.[20]

---

[20] Although Ms. King does not expressly argue that the Commissioner failed to develop the factual record adequately with respect to her physical impairments, the Court recommends that on remand, the Commissioner seek out further evidence on this point. Notably, the documents Ms. King submitted with her Complaint contain several medical records indicating that Ms. King has been diagnosed and treated for neck and low back pain. See [ECF No. 1 pp. 35, 38]. In light

## V.       CONCLUSION

For the foregoing reasons, the Plaintiff's Motion [ECF No. 26] is hereby <u>ALLOWED</u>,

and the Commissioner's Motion [ECF No. 28] is <u>DENIED</u>.[21] The decision of the Commissioner

in this case is hereby <u>REVERSED</u> pursuant to 42 U.S.C. § 405(g), sentence four, and

<u>REMANDED</u> to the Commissioner for further proceedings consistent with this decision.

**SO ORDERED.**

Dated: September 11, 2015                                             /s/ Allison D. Burroughs
                                                                                      ALLISON D. BURROUGHS
                                                                                      DISTRICT JUDGE

---

of Ms. King's <u>pro se</u> status and mental health issues, the Commissioner has a heightened duty to
investigate the facts and develop arguments for granting benefits. <u>See</u> <u>Heggarty</u>, 947 F.2d at 997
<u>Deblois</u>, 686 F.2d at 81; <u>Mickevich</u>, 453 F. Supp. 2d at 287 (where there was enough evidence in
the record to suggest that claimant had a potential mental health issue, ALJ was "under an
obligation to probe further").

[21] In so ruling, the Court does not mean to suggest that it necessarily disagrees with the
substantive conclusions reached by the ALJ. Rather, the Court simply finds that the record was
not sufficiently developed in certain respects, and that the ALJ's decision failed to discuss
certain impairments.